**PINSON TRANSFER COMPANY, Inc.,**
Appellant,

v.

**McDUFFEE MOTOR FREIGHT, INC,.**
et al., Appellees.

Court of Appeals of Kentucky.

Feb. 3, 1961.

Rudy Yessin, Frankfort, for appellant.

Chat Chancellor, Frankfort, for appellees.

PALMORE, Judge.

Pinson Transfer Company, Inc., appeals from a judgment of the Franklin Circuit Court setting aside an order of the Department of Motor Transportation granting its application for a common carrier truck certificate to extend its operations beyond the scope of an existing certificate theretofore issued to it.

The broad requirements of KRS 281.-630(1) for the granting of a common carrier certificate are: (1) that the appellant is fit, willing, and able properly to perform the service proposed, (2) that the

existing transportation service is inadequate, (3) that the proposed service is or will be required by the present and future public convenience and necessity, and (4) that the proposed operation will be consistent with the public interest and the transportation policy of Chapter 281.

Though Pinson would have it otherwise, the problem is much the same as that presented in the recent case of Combs v. Johnson, Ky.1960, 331 S.W.2d 730, wherein it was held that the delays in transporting motor freight from Louisville to points in eastern Kentucky occasioned by the necessity of interchanging at Lexington do not, under KRS 281.630 as construed in Eck Miller Transfer Co. v. Armes, Ky.1954, 269 S.W.2d 287, in themselves constitute a sufficient showing of inadequate service to justify authorizing a new service over a route already served by another carrier.

Under its existing certificate No. 63 Pinson's service reaches from Lexington to the environs of Ashland, Inez, Pikeville, Jenkins and Harlan. Except for the Harlan area it is the only carrier serving this Eastern Kentucky region from Lexington. So far as we are concerned in this case about 70% of the intrastate freight from Louisville received by Pinson at Lexington is delivered to it by McDuffee Motor Freight, Inc., the principal appellee, and the remaining 30% by seven or more other motor carriers. It is there classified according to its several destinations and reloaded into Pinson's equipment along with freight from other sources.

The unloading and re-loading process at Lexington results in at least one day's delay, and usually more than that. Consequently, the average transit time from Louisville to the destinations served by Pinson is 3 to 5 days. Conceiving that a substantial reduction in this time could be effected by reducing the volume of interchange at Lexington, Pinson applied in this proceeding for an amendment or extension of its certificate No. 63 whereby it would be authorized to operate directly from Louisville, but without serving intermediate points between Louisville and Lexington or serving Lexington itself. The application sought authority also for service between Ashland and Maysville, but for the moment we shall defer that phase of the case.

Ten carriers protested the application at the initial state of the proceeding. One protest was dismissed on technical grounds and two were voluntarily withdrawn. Three of the protesting parties filed exceptions to the examiner's report and recommendations, which were favorable to the application. The Department approved the examiner's report and granted the application, whereupon an appeal was taken to the Franklin Circuit Court by two of the protestants, who for our purposes may be considered one and the same as McDuffee. On a review of the proceedings the circuit court set aside the order of the Department on the ground that the following findings of fact were not supported by substantial evidence (KRS 281.-630, 281.785):

(1) That Pinson is fit, willing and able to perform the service contemplated;

(2) That the present and future public convenience require the granting of the application; and

(3) That the granting of the application is in the public interest (because the existing delays are caused by Pinson itself in failing to rehandle the freight promptly at Lexington).

McDuffee delivers freight in Lexington during the night immediately following the day on which it is picked up in Louisville. This is conceded to be adequate service from Louisville to Lexington, and it is further conceded that if Pinson were dealing only with McDuffee the interchange could be so coordinated that there would be no necessity for the application in question. But the problem at Lexing-

ton is that Pinson is required to accept interchange traffic arriving at various unscheduled times from numerous other carriers over whom it has no control.

Pinson's plan for better service envisages running four carrier units out of Louisville daily, each routed for a different sector of eastern Kentucky. It would then be necessary only that the freight gathered at Lexington locally or from connecting carriers be added to the partial loads theretofore placed aboard the vehicles at Louisville. The Department's order granting the application recites that a minimum of 2 to 3 days will be eliminated by this procedure, but there was no finding of fact to that effect and it is, at best, a speculative conclusion founded on insubstantial evidence. Analysis of the testimony reveals that the freight received from Louisville (70% of which is carried by McDuffee) can scarcely amount to much over 20% of the total handled by Pinson out of Lexington, and that the balance of Pinson's volume originates at sources (including Lexington itself) other than Louisville. This means, of course, that under any circumstances, even if Pinson should succeed in taking all of the business at Louisville away from McDuffee and the other carriers hauling from Louisville to Lexington, the problem of handling and rehandling at Lexington is bound to continue in existence. Pinson's chief witness undertook to explain some incomprehensible stratagem by which a substantial part of this balance might be "forced" through Louisville rather than Lexington as a gateway, but was not very convincing.

Adverting again to Combs v. Johnson, Ky.1960, 331 S.W.2d 730, 731, whatever inadequacy now exists in transportation service from Louisville to the mountain area of eastern Kentucky seems in a large measure to result from physical circumstances beyond the control of the carriers or the Department of Motor Transportation. Freight originating or picked up at Louisville must, somewhere along the line,

be broken up for delivery in smaller quantities at widely scattered destinations, and that process inevitably consumes time. Service to consumers at the various destinations is bound to reflect the influence of volume on the economics of transportation. The greater the volume of freight destined from Louisville to an individual community in eastern Kentucky, the more efficient can be the transportation service between the two points. Conversely, overnight service to an isolated community requiring one crate of freight per week could hardly be regularly assured so long as carriers depend on profits for their existence. There is, of course, the distinct prospect that improved service to eastern Kentucky from Louisville would of itself stimulate enough additional volume to support it, and it is quite possible that with qualified expert testimony, supported by comprehensive statistical data, the probability of such a result could be established with sufficient reliability for it to be considered as a tangible factor in a case of this sort. But the mere prospect, the hope, alone is of no evidentiary value.

The Combs case involved the proposed addition of a new carrier, whereas this case involves an additional carrier for the westerly end of the route only, but the principle is the same. Pinson suggests a distinction on the theory that the failure of the several carriers (other than McDuffee) operating between Louisville and Lexington (none of whose service is as efficient as McDuffee's) to file exceptions to the examiner's findings and report favoring Pinson's application suffices as a showing of inadequacy through indifference or disregard of the rights of consumers. We do not think the distinction is tenable. So long as there is one carrier ready, willing and able to perform the service the ground of indifference will not stand. McDuffee's daily haul from Louisville to interchange with Pinson at Lexington averages one trailer load or less, and, as we have said, that amounts to some 70% of the total received by Pin-

son from Louisville. Obviously, McDuffee could easily handle the other 30%. His capacity to absorb the whole, coupled with the admitted efficiency of his service, renders insignificant the inadequate service of his Louisville to Lexington competitors.

It is strongly urged for Pinson that the principles governing this case are the same as in Southeastern Greyhound Lines v. Taylor, 1948, 306 Ky. 767, 209 S.W.2d 330, but despite certain nonessential similarities we do not recognize the respective situations as being comparable.

■ Our view of the case makes it unnecessary to consider whether and to what extent Pinson itself is responsible for the delays after the freight is delivered at Lexington. It is also of no avail to balance the public need for better service against the incidental damage to McDuffee should Pinson's application be granted. The critical point is that Pinson was unable to produce substantial evidence of its own ability to eliminate an inadequacy existing not from the failure of existing service, but to a large extent from natural economic and physical factors. For the same basic reason the proof will not support a finding that existing service is in fact inadequate under the criterion stated in Eck Miller Transfer Co. v. Armes, Ky. 1954, 269 S.W.2d 287. Therefore, Pinson has not met either of the first two requirements of KRS 281.630(1) as above set forth, and in view of their inherent interdependence it then becomes impossible to satisfy the third and fourth. So we conclude that the order of the Department of Transportation with respect to the Louisville-Lexington service was properly set aside.

■ Returning now to that portion of the order granting authority to operate from Ashland to Maysville, and vice versa, serving all points between, it was shown that no other carrier possessed such authority, that there is a public necessity for the service, and that those carriers who are permitted to reach the intermediate points are not rendering adequate service there. The only carrier that protested this phase of the application failed to except to the examiner's report and was not a party on the appeal to the Franklin Circuit Court. We think the Department's order was amply supported in this respect and that the circuit court erred in vacating the order in toto.

The judgment is affirmed except to the extent that it sets aside that portion of the order of the Department of Motor Transportation granting appellant a certificate to operate between Ashland and Maysville, serving all intermediate points. In the latter respect the cause is reversed and remanded with directions to enter a judgment sustaining the order of the Department of Motor Transportation.